## In re UNITED FUNDS MANAGEMENT CORPORATION.

No. 17505.

District Court, W. D. Missouri, W. D.

Dec. 21, 1943.

Paul V. Barnett, of Kansas City, Mo., for indenture trustee.

John C. Grover and J. L. Milligan, both of Kansas City, Mo., for trustee in bankruptcy.

Cornelius Roach, of Kansas City, Mo., for bankrupt.

COLLET, District Judge.

The claims for interim allowance of fees to the trustee in bankruptcy, his counsel, counsel for the bankrupt, the indenture trustee and its counsel must be determined. The problem is approached with some trepidation, as it is not only desirable but essential that able, conscientious services be adequately compensated for and at the

---

same time the proceedings retain the predominate characteristic of being for the benefit of creditors. The comparatively little guidance which may be obtained from reported cases makes the problem a difficult one.

This is not the usual type of bankruptcy proceeding. Although initiated upon the voluntary petition of the bankrupt, an investment trust, yet it was involuntary to the extent that probably it resulted from the industry and efficiency of the Securities Exchange Commission in discovering that the plan of operation of the bankrupt's business could not be expected to permit the discharge of the contractual obligations of the company to its investor-creditors unless uncertain contingencies occurred, and the prompt action of the Commission in instituting proceedings, seeking to enjoin the continuation of the business on the plan of operation being followed. The very fact that these proceedings were brought about when they were—at a time when financial difficulties were only prospective and had not yet actually been encountered, will undoubtedly result in a more equitable distribution of the bankrupt's assets among all of its obligees, a much higher percent of payment to all, and, because of present financial conditions generally, an easier and more beneficial liquidation.

This is not the usual type of bankruptcy proceeding for another reason. The business of the bankrupt was that of acquiring securities, placing them in the hands of an indenture trustee, and selling to the public certificates representing an undivided interest in the trust estate. The indenture provided that the indenture trustee should, under certain eventualities, including the bankruptcy of the company, liquidate the trust estate, retain a reasonable compensation for its services, pay the certificate holders the amount due on their certificates, and deliver the remainder, if any, to the bankrupt estate. The indenture trustee has been actively and effectively liquidating the trust estate. The trustee in bankruptcy and his counsel have rendered services of magnitude in the tabulation of the lists of certificate holders, in calculating, in conjunction with the indenture trustee, the amount due on the certificates, in determining against what certificates loans have been made by the certificate holders, in investigating the value of securities in the trust estate, with the view of protecting the bankrupt estate's right to any equity that might exist after the discharge of the certificate holders' claims, in effecting the liquidation of similar trust estates in other states, in handling claims against the bankrupt estate proper, in segregating the funds which have been paid to the bankrupt but should have been paid to the indenture trustee from the bankrupt estate and delivering them to the indenture trustee, in collecting (by order of the court) from the indenture trustee moneys paid the indenture trustee to which the bankrupt estate proper was entitled, and many other services incident to the handling of a complicated financial institution having many thousand obligees.

This is not the usual bankruptcy proceeding for the further reason that the efforts of all parties concerned have been unusually successful and beneficial to the interest of all creditors, so unusual that it is now and has for some time been reasonably apparent that practically all, if not all certificate holders, will receive at least the full cash surrender value provided in their certificates, with a very substantial equity to be devoted to the payment of general claims against the bankrupt estate. The trustee in bankruptcy has disbursed approximately $150,000 and there remains approximately $75,000 in cash in the bankrupt estate, irrespective of the so-called trust estate. Application has been made by the indenture trustee for authority to make a partial distribution to certificate holders of sixty percent of the cash surrender value of their certificates (except certificates against which loans have been made). That authority has been granted with directions to the trustee in bankruptcy to verify from the books of the bankrupt the propriety of all payments to be made and report any erroneous or questionable payments. That distribution is now being made and checks to certificate holders, several thousand in number, are being delivered as rapidly as facilities will permit. The total distribution at this time will be approximately $750,000 to $1,000,000. These things are alluded to in order that certificate holders and other creditors may have a clearer conception of the factual considerations entering into the payment for services rendered in their behalf. No reference has been made of the participation in the foregoing matters by the attorney for the bankrupt for reasons which will be noted hereafter. It should be noted, however, that he has performed service of material value to the entire estate.

█ Absent exact criteria for determining the proper amount of the fees to be allowed, general principles must first be established and then applied. In general terms, those principles are that services which are performed with less expense to the beneficiary, which result in the more expeditious realization of benefit to the beneficiary and which result in a greater quantum of benefit to the beneficiary should be compensated for at a higher rate than services that are correspondingly wasteful, ineffective and inefficient. Otherwise stated, there should be a premium on efficiency and a penalty for wastefulness and inefficiency. But the premium must not exceed the value of the additional benefit resulting from unusual economies or extraordinary efficiency.

While, as heretofore noted, this is not an ordinary bankruptcy proceeding in many respects, and hence the fees allowed in the "mine run" bankruptcy case may not be used as a safe criterion for present purposes, yet some benefit to the determination of the question now presented may be derived from statistics made available by Mr. Chandler's remarkably complete and informative report entitled "Tables of Bankruptcy Statistics with reference to bankruptcy cases commenced and terminated in the United States District Courts during the fiscal year ending June 30, 1942", prepared as a part of the work of the Administrative Office of the United States Courts.

During the period covered by the report, the total payments to creditors in asset cases in all of the eighty-four Districts, the District of Columbia and the territories and possessions was 18.2% of the total liabilities. 42.6% of priority claims were paid, 54.8% was paid on secured claims and 9.5% on unsecured claims. The comparatively large difference between the overall percent paid all creditors and the percentage paid on priority and secured claims indicates that the payments made to priority and secured creditors represented a comparatively small percent of the total amount paid all creditors. The major portion of the administrative work, therefore, related to the application of funds realized to the payment of unsecured creditors. It is, of course, impossible to determine the nature of the assets represented by these figures and hence a direct comparison of the difficulties of liquidating them with the effort devoted to the liquidation of the assets involved in this case cannot be made. It is reasonable to assume, however, that the liquidation of securities having a rather ready market such as those constituting the trust estate would present fewer administrative problems but require a more technical knowledge than the average of all assets in all bankruptcy cases.

The 18.2% paid to all creditors on their claims represented 76.1% of all amounts realized from all assets, the remaining 23.9% being paid for administrative fees and expenses.

The overall average of 23.9% paid for administrative expenses throughout the country amounted in dollars to a total of $8,059,109.44. In this Judicial Circuit the percentage of the amount realized from assets which was paid for administrative fees and expenses was somewhat higher, being 29.3%, which represented a total payment of $387,581.22 for the distribution of $1,322,030.62 to creditors.

In the Eastern District of Missouri, the percentage of all amounts realized from assets which was paid for administrative fees and expenses is still higher, being 33.6%, only three districts in the Circuit being higher, Minnesota with 45.1%, South Dakota with 42.7% and North Dakota with 41.7%. However, the Dakotas should be eliminated for present purposes as in North Dakota only five cases were terminated with total liabilities of $62,353.09, with the total realized from assets of $9,975.72, total payments to creditors of $3,209.83 (5.1%), and with 26.1% paid to the bankrupts in lieu of exemptions, while in South Dakota only eight cases were terminated with total liabilities of $1,041,659.51, total amount realized $41,618.70 and total payments to creditors of $23,280.00 (2.2%).

In the Western District of Missouri, the percentage of all amounts realized from assets which was paid for administrative fees and expenses was 24.8%, only two Districts in the Circuit being lower. While the percent of all liabilities paid throughout the country was 18.2%, the corresponding percentage in this Circuit was 13.1%, in the Eastern District of Missouri 15.3%, and in this District 12.2%. The time consumed in finally liquidating the estates furnishing the foregoing statistics is not determinable.

The foregoing statistics probably prove nothing which was not already known without resort to them. Certainly they represent to an extent a "quotient verdict", so frequently condemned, but they do furnish

some basis for comparison or results obtained. A comparison of those averages with the already ascertained or ascertainable results in this case discloses that while in the general administration of all bankrupt estates only 18.2% of all liabilities were paid, in this estate that percentage may reasonably be expected to exceed eighty or even ninety percent. That whereas an average of 54.8% was paid on secured claims, this estate will in all probability pay 100%, 60% of which is now being paid, and within approximately fourteen months after bankruptcy.

While beneficial results should augment and poor results diminish fees to be allowed, counsel and the trustees will agree that the extent of remuneration should not depend entirely on results obtained. In fact, the largest claim presented is based primarily on the amount of time and labor involved without primary regard to the result of those efforts. Considering the question from that perspective, some further comparisons may be drawn from Mr. Chandler's report. Since this estate consists to a very great extent of secured claims [1] the comparison should be made to that type of claim. The report shows that in the Third Circuit, the secured claims allowed totaled $2,719,000.13 and in the Sixth Circuit that class totaled $2,804,905.59. That class of claims in this entire estate, including some in which this indenture trustee is not directly interested, will approximate $2,400,000, the exact amount not being determinable at this time, of which total from $750,000 to $1,000,000 is being paid at this time. In the Third Circuit the $2,719,000.13 in preferred claims represented only approximately 14.2% of all claims. Approximately $1,000,000 was paid in administrative expenses, which included approximately $500,000 in comparable fees and commissions. Approximately 14.2% of this $500,000 theoretically, at least, may be allocated to services in connection with secured claims. Such allocation results in the apportionment of approximately $71,000 to fees and commissions chargeable to secured claims.

In the Sixth Circuit, the secured claims represented 15.1% of all claims. $765,974.-25 was paid for administrative expenses, which included approximately $366,000 for fees and commissions comparable to those now under consideration. Of that $366,000,

15.1% or approximately $55,000 would be allocable to secured claims.

In the Third Circuit, the total number of cases was 603, the average amount of liabilities per case approximately $31,800, and the average amount realized per case $6,-420.81. In the Sixth Circuit, the total number of cases was 782, the average amount of liabilities per case approximately $23,750, and the average amount realized per case $4,116.68. Logically the percentage of fees to the total amount involved would be larger in a large number of small cases than for one case involving an amount equal to the total of the small cases. The claims presented are for interim allowances on account for the following amounts:

For the Indenture Trustee..... $46,500.00
For the Indenture Trustee's
   Counsel ................... 10,000.00
For the Trustee in Bankruptcy 10,000.00
For the Trustee in Bankruptcy's
   Counsel .................... 25,000.00
For the Bankrupt's Counsel.... 10,000.00

The total amount involved is an important factor and the percentage of fees to that amount is likewise of importance. It is, of course, well understood that the percent of fees to the total should decrease as the total increases. The fact that the securities have had a comparatively ready market at good prices is also to be considered. The opportunity for subsequent adjustment of inequities after liquidation is complete and creditors have had an opportunity to be heard on final allowances (which has not been afforded them as to the claim of the indenture trustee or its counsel) will insure against any mistakes.

The claim of counsel for the bankrupt should be held in abeyance pending further proof concerning the payment of approximately $5,000 to him by the bankrupt on the eve of bankruptcy.

There appears to be no decided disparity between the amount of the other claims but the total is more than can be justified as an interim allowance. The following amounts will be allowed at this time:

■ To the indenture trustee, $27,900, to be allocated as follows: $21,000 to "Series L", $3,900 to "Series F", and $3,000 to "Series H";

■ To counsel for the indenture trustee, $6,000, to be allocated as follows: $5,-

---

[1] Approximately 83% if certain claims are allowable, approximately 98% if those undetermined claims are not allowable.

000 to "Series L", $600 to "Series F" and $400 to "Series H".

The foregoing amounts to be paid out of the funds in the hands of the indenture trustee. And that trustee is authorized and directed to make such payments forthwith from the respective trust funds noted.

To the trustee in bankruptcy, $6,000;

To counsel for the trustee in bankruptcy in equal amounts to each a total of $15,000.

The latter amounts, totaling $21,000, shall be paid from the funds of the bankrupt estate in the hands of the trustee in bankruptcy and he is authorized and directed to make such payments forthwith.

A ruling upon the claim of counsel for the bankrupt is reserved until the further order of the court.